UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HASSAN CHUNN; NEHEMIAH McBRIDE; AYMAN RABADI, by his Next Friend MIGDALIZ QUINONES; JUSTIN RODRIGUEZ, by his Next Friend JACKLYN ROMANOFF; ELODIA LOPEZ; and JAMES HAIR, | No. 20 Civ. 01590 |
| individually and on behalf of all others similarly situated, | **FACILITY EVALUATION: METROPOLITAN DETENTION CENTER COVID-19 RESPONSE** |
| Petitioners, | |
| *-against-* | |
| WARDEN DEREK EDGE, | |
| Respondent. | |

## I.    Executive Summary

1.      I visited the Metropolitan Detention Center in Brooklyn, New York (the "MDC") on April 23, 2020.  I was alarmed by the facility's failure to implement simple procedures, in-line with the Center for Disease Control (the "CDC) guidelines, that could identify patients ill with COVID-19, prevent the spread of COVID-19 throughout the facility, and ensure that high-risk patients receive adequate care.

2.      Multiple systemic failures in the COVID-19 response in the MDC impede the facility's ability to know when people become ill with COVID-19.  Most people within the MDC are not being effectively screened for COVID-19 signs or symptoms.  When the MDC staff screens people for COVID-19, they rely only on temperature checks, which is a serious deviation from accepted standards.

3.      The MDC's response to COVID-19 is largely reliant on a broken sick-call system that does not function adequately.  By that, I mean patients report symptoms of COVID-19, but

such reports by patients are not acted on.  Patients may repeatedly submit sick call requests with COVID-19 concerns, but the facility lacks the clinical response to find and care for those individuals.  It also lacks the interest in aggregating that information to understand the symptoms in terms of the overall outbreak in the facility.  MDC is therefore not prepared to effectively contain any outbreak of COVID-19—its practices put detainees and staff at grave risk of infection, serious illness and even death.  On an urgent timeframe, the MDC should implement an immediate system to track symptoms of COVID-19.

4.      Not only is MDC ill-equipped to identify cases of COVID-19 within its population, but it has not implemented adequate infection control practices.  In fact, it is my assessment that several current practices in MDC actually promote a more rapid spread of COVID-19 inside the facility and serve to work against some of the infection control measures already in place.  Detainees do not have access to adequate cleaning solutions or personal protective equipment ("PPE"); members of staff were not always wearing gloves or masks; and the COVID-19 isolation unit that I observed contained (i) detainees confirmed to have or suspected of having the virus and (ii) detainees who did not or were not suspected of having COVID-19.

5.      Finally, current practices in the MDC do not adequately identify and protect detainees who are particularly vulnerable to the effects of COVID-19 due to their high-risk underlying medical conditions.  In fact, the MDC has not implemented any special procedures for these high-risk detainees.  I am therefore concerned that lasting damage to these detainees' health could result if they are infected by COVID-19 even though it could likely be avoided if easy to implement screening and isolating practices were implemented by MDC.

6.     The net effect of these failings is that individuals within the MDC will be infected with COVID-19 and they will be identified at a dangerously late stage of infection.  I am concerned that there may be a significant number of cases of COVID-19 that are undetected, both propelling the pace of the outbreak within the MDC—and because the MDC is not a closed system—the larger community.  The MDC's failures, described in detail below, represent gross deviations from adherence to correctional standards of care and CDC guidance.  All the measures that I recommend are critical to finding and caring for individuals who are sick, and answering the question of how widespread the virus is in the facility.

## II.     Background

7.     I am a physician, internist, and epidemiologist with over a decade of experience in providing, improving, and leading health services for incarcerated people.  My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009).  My experience in correctional health includes two years visiting immigration detention centers and conducting analyses of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security.  This work included and resulted in collaboration with U.S. Immigration and Customs Enforcement ("ICE") on numerous individual cases of medical release, the formulation of health-related policies, and testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

8.     After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City.  This position included both direct care to persons held in NYC's 12 jails, as well as oversight of medical policies for their care. This role included oversight of chronic care, sick call, specialty referral and emergency care. I

subsequently was promoted to the positions of Medical Director, Assistant Commissioner, and Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews as well as all training and oversight of physicians, nursing and pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including the use of force and restraints.

9.     During this time, I managed multiple communicable disease outbreaks including H1N1 in 2009, which impacted almost 1/3 of housing areas inside the adolescent jail, multiple seasonal influenza outbreaks, a recurrent legionella infection and several other smaller outbreaks.

10.     In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

11.     The following report is submitted as an evaluation of the COVID-19 response currently underway in the Metropolitan Detention Center (MDC), administered by the Federal Bureau of Prisons in Brooklyn New York  (the "BOP"). The purpose if this report is to focus on the adequacy of infection control and other public health measures currently being implemented to prevent serious illness and death among staff and detained people within this facility, and the impact of COVID-19 on surrounding health systems.

12.     I have conducted this evaluation and review of documents with the following questions in mind:

4

a.      Do current practices in MDC adequately detect the number and severity of COVID-19 cases among staff and detainees and respond in a manner consistent with CDC guidelines and other established clinical standards of care?

b.      Do current practices in MDC adequately slow the spread of COVID-19 through the facility and between people, both staff and detainees in a manner consistent with CDC guidelines and other clinical standards of care?

c.      Do current practices in MDC adequately identify and protect high-risk detainees from serious illness and death from COVID-19?

## III.    Methodology

13.      In order to prepare this report, I visited MDC on April 23, 2020 and physically inspected the facility. I toured and examined the entry and screening area, four housing areas, and the health services unit. Housing areas inspected included the special housing unit, unit 82 (cadre), unit 41, and unit 84 (isolation).

14.      During this inspection, I was able to speak with 17 detained people. My interactions with detained people included asking the following structured questions:

a.      Have you been around anyone you thought had COVID-19?

b.      What has this facility done to prepare for COVID-19?

c.      Have you been asked any questions about COVID-19 by health staff?

d.      How have you reported concerns about your health (including COVID-19) in this facility?

5

     e.     Who wears masks and gloves in this facility and how do they get this equipment?

     f.     Who cleans inside cells in this facility and how and how often do they get cleaning supplies?

     g.     Who cleans outside cells in this facility and how and how often do they get cleaning supplies?

15.     In addition to the visit to the facility I was able to review the following records and information:

     a.     Sick-call requests for inmates detained at MDC (electronic and paper);

     b.     Detainee sick-call data and requests;

     c.     BOP COVID-19 policies and procedures;

     d.     Amended Petition dated April 23, 2020;

     e.     Medical records of Mr. ▮▮▮▮▮▮▮▮

     f.     Transcript of deposition of Stacey Vasquez pursuant to Fed. R. Civ. P. 30(b)(6) dated April 27, 2020;

     e.     BOP screening tools; and

     f.     BOP statistics on COVID-19 at BOP facilities.

16.     The  information I have gathered via the above referenced documents, in conjunction with the results of my physical site visit, are sufficient for me to come to the conclusions drawn below, with a high degree of confidence.

## IV.    Assessment of the MDC Facility's COVID-19 Detection Practices

17.     Current practices in the MDC likely fail to detect all cases of COVID-19 and also fail to even track the presence of COVID-19 symptoms throughout the facility.  Therefore, the

number of infected detained people and staff is likely much larger than currently appreciated. There are several reasons for this failure to detect COVID-19 infection. These reasons are set out below.

      A.    <u>Most People are Not Screened for COVID-19 Signs and Symptoms</u>

    18.    The CDC recommends that all new admissions to a detention facility be screened for both signs and symptoms of COVID-19. This process includes asking about common symptoms of COVID-19 such as cough, fever, shortness of breath, and also includes asking about contact with people who have had COVID-19 and checking temperature.[1] Several people I spoke with reported that they had not been screened at all when they arrived in MDC, a clear deviation from basic CDC guidelines.[2] As a result, it is likely that COVID-19 is easily being brought into the MDC from newly arrived detainees.

    19.    Active surveillance was not in place for COVID-19 across multiple housing areas within the MDC. While some of the housing areas did report that daily temperature checks had started in the past two weeks, I was told that the frequency of these checks had declined from once per day to once every two to three days.[3] In addition, no other signs of COVID-19 appeared to be checked in these housing areas, including heart rate and blood oxygenation monitoring.[4]

    20.    A sign posted on the door into housing area 41 read "Number of people with COVID symptoms-0". However, based on my interviews with people on that unit, no symptom

---

[1] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dialysis/screening.html



screening was occurring at all, and the limited checking of a single sign—temperature—was intermittent.  This is grossly inadequate because the CDC makes clear that COVID-19 can present with many signs or symptoms and that screening and surveillance should be focused on asking about symptoms as well as detecting elevated temperature.[5]

21.     Further, none of the people I spoke with reported symptom screening.  That is, they were never asked whether they had cardinal symptoms of COVID-19 including, for example: fatigue, shortness of breath, cough and other symptoms identified by the CDC.[6]  It is essential that such active screening should be part of any during a viral outbreak.  To fail to do so can result in catastrophic consequences to populations exposed to a communicable virus, such as COVID-19.

B.     <u>MDC Relies on a Defective System to Detect Cases of COVID-19 Internally</u>

22.     It is best-practice for correctional facilities to implement an effective "sick-call" system to ensure that people who are ill or have medical concerns can receive timely and clinically competent assessments and treatment.  I observed that MDC's own sick-call system was defective, and is likely to aid the spread of COVID-19 throughout the facility.

i.     *Sick Calls Were Ignored*

23.     When I asked detainees about how they access health services in MDC, they reported that they fill out both electronic and paper sick call requests.  Problematically however, the detainees indicated that it generally takes several requests and between 3-7 days to be seen by medical staff.  Other detainees indicated that medical staff never responded at all.

[5] https://www.cdc.gov/coronavirus/2019-ncov/hcp/dialysis/screening.html
[6] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

24.     Multiple detainees reported filling out these sick-call forms repeatedly because they feared they had COVID-19.[7]  After multiple requests, the only response was for a health staffer to come to their cell and take their temperature.  However, no thorough symptoms were elicited and no other physical examinations were conducted.  According to the detainees, this was the case even when they reported having shortness of breath.[8]

25.     My review of sick-call forms also indicates major systemic problems with the MDC sick-call system.  A review of recent electronic sick-call requests made between March 13, 2020 and April 13, 2020 from the MDC shows that large numbers of detainees have reported symptoms consistent with COVID-19 infection.[9]  A total of 147 sick call requests during this time include symptoms that are associated with COVID-19 including trouble breathing, fever, cough and weakness.  I reviewed each of these sick call requests and among them are 37 people who had repeated sick call requests during this timeframe.  More of the requests that I reviewed may in fact represent repeated complaints for the same or similar concerns, but these 37 only reflect the instances in which the person expressly identified their concerns as a repeat.  In addition, 11 of these sick call requests included detained people reporting symptoms of COVID-19 among other detained people.

26.     Based on my review of BOP statistics amongst detainees and staff at the MDC, which as of April 28, 2020 reported "Inmates tested: 13, Inmates positive: 6, Staff Positive: 30," I am concerned that these statistics may reflect the early stages of exponential growth.

---

[7] People who reported filling out multiple sick call requests with COVID-19 symptoms and without receiving a timely response include Mr. ████████████████████████████████████ .
[8] ████████████████████████████████ (82); ████████████████████████████████ (84); ████████████████ (82).
[9] Petitioners' attorneys provided access to sick call requests.  Criteria utilized for COVID-19 symptoms were based on CDC criteria.  Petitioners' attorneys created a spreadsheet that categorized sick call requests by date, symptoms and other demographic information.  Sick call forms for patients reporting COVID-19 symptoms were reviewed by myself.

27.     Given the systemic concerns with addressing the sick-call system in MDC, heavy consideration should be given to testing all people detained in MDC. Because the facility has not taken measures to detect, track and act on the level of symptoms among detainees, and because the systems required to implement an adequate response to COVID-19 will take time to implement, I believe it is essential to implement a phased testing of detained people, starting with high risk patients and those who present with COVID-19 symptoms.

ii.     *Paper Sick-Calls Were Destroyed and Not Scanned to Patient Medical Records*

28.     I have reviewed, and was alarmed by the transcript of the deposition of Stacey Vasquez dated April 27, 2020 (the "Vasquez Deposition"). Ms. Vasquez is the Health Services Administrator at MDC. During Ms. Vasquez's deposition, she indicated that MDC does not retain the original sick-call requests and scan them into the electronic medical record of patients and that this is a routine practice.[10]

29.     This represents a gross deviation from basic health care standards because the sick-call requests form part of the patient's medical record. Without this practice, the health service does not know how many requests were made, and how many were responded to. It also renders impossible any evaluation of whether the assessment and care provided was appropriate to the patient's original concerns. This is especially problematic in cases of non-English speakers such as the two men identified in the case examples described below.

30.     Ms. Vasquez's deposition testimony also included a confusing justification suggesting that scanning-in these records would represent an infection control concern—as if the scanning in of a piece of paper, after it had made its way from the patient, to a sick-call box, to a

---

[10] Vasquez Deposition, pg. 196:14-18.

staff member to pick up, and then to clinic to arrange and deliver care, would pose a threat to staff or the machine utilized to scan in the records.

31.     This practice, described by Ms. Vasquez, appears to be the intentional destruction of medical records. Doing so ensures that the facility cannot conduct basic quality assurance, including whether sick-call requests are acted on in a timely manner. During a viral pandemic, such as the COVID-19 outbreak, this is a very alarming practice.

### iii.   *MDC Response to Urgent Sick-Calls Is Inadequate*

32.     While I was present at the MDC facility, several patients reported that when they had an urgent or emergent medical problem, the only response was for staff to come and take their temperature, without removing them from their cell for clinical assessment.

33.     Two detainees with a history of asthma reported having asthma attacks.  In both cases, a nurse responded and took their temperature, but never listened to their lungs or took their peak flow measurement, both of which are  requirements for assessment of an asthmatic patient[11].

34.     These responses raise the concern that MDC is not only failing to provide adequate COVID-19 response, but is failing to provide the most basic assessment of patients in other types of medical distress or emergency.  Should the COVID-19 outbreak increase within the MDC, these failures could compound the problem and lead to worse medical outcomes for detainees suffering from COVID-19 or other illnesses.

### iv.   *MDC Nurses Are Not Attending to Sick-Calls or Tracking COVID-19 Symptoms*

35.     The Vasquez Deposition also revealed a lack of basic outbreak management in MDC regarding sick-call requests.

---

[11] ███████████████████ (82); ███████████████████ (82)

36.     Basic correctional practice during a communicable viral outbreak is to assign a nurse to review every sick call request on a same day basis.  These reviews are structured, with an eye towards the specific symptoms identified by leadership.

37.     In the outbreaks I have managed, we would create a template for nurses conducting an outbreak sick-call review so that they could pull out any requests that included rash, spider bites, or fever in the case of MRSA outbreak; or, fever, cough, or sore throat during H1N1, for example. This subset of sick-call request is then used for two purposes. First, on the clinical side, these patients are seen immediately (same day or next morning) for assessment. Second, on the outbreak management side, these symptoms are put into a simple spreadsheet that can track the overall incidence of various symptoms by date and location within a certain facility.

38.      This approach is absolutely essential to tracking the spread of any outbreak and I have utilized it in managing outbreaks of H1N1, Legionella, MRSA, Clostridium Difficile diarrheal illness, seasonal influenza and numerous other instances.  I would have expected to have seen such a system implemented at MDC given the severity of the current COVID-19 outbreak.

39.     When asked about the tracking of COVID-19 symptoms, Ms. Vasquez, who is the lead health administrator for MDC, stated that this was not being done and that it was not possible given their data systems. I believe that approach I have outlined above is entirely possible at MDC, because, as stated above, I have implemented it in both paper and electronic record settings. I view this refusal to track the incidence of COVID-19 symptoms among the patients in their charge as especially egregious and intentionally designed to avoid knowing the extent of the outbreak and providing the necessary care.

**V.      Assessment of the MDC's Mitigation Practices to Slow the Spread of COVID-19**

40.     Based on my physical inspection of the MDC, it is my assessment that several current practices in MDC actually promote a more rapid spread of COVID-19 inside the facility and serve to work against some of the infection control measures already in place.

A.     MDC has Not Implemented Adequate Infection Control Practices

41.     The CDC has identified basic guidelines for infection control and overall COVID-19 response in detention settings, many of which the MDC appears to have ignored.  For example, I would have expected—at minimum—that the MDC had sufficient levels of PPE, cleaning solution and equipment, an adequate quantity of tests available and that common, high-touch surfaces such as phones and computers would be cleaned between uses, and that no-tough waste receptacles would be present in the facility common areas and housing areas.

42.     Detainees that I spoke with indicated significant gaps in access to cleaning solutions, with some reporting that they receive insufficient cleaning solution for their cell area.[12] In addition, several detainees including Mr. Rabadi reported that they have not observed any cleaning of the phones, despite being used by one detainee after another.

43.     While at MDC, I observed several correctional staff not wearing gloves or masks, and it was not clear who was mandated to wear masks or gloves.  Staff wore loose-fitting surgical masks even in the Isolation unit.

44.     No trash containers were present in any of the hallway areas we toured, or in the common spaces outside the elevators. None of the trash containers I observed allowed for hands free depositing of gloves or masks or other PPE, except in the treatment room of the medical clinic.

---

[12] ███████████████████████████ SHU); █████████████████████ (SHU); ████████ ███████████ (SHU).

45. Further, in the isolation unit which I understood was for those detainees who were COVID-19 positive or presumed positive, a cart referred to as a "PPE cart" was located in the entry area to the unit, but lacked any gowns or masks. When I entered the unit, detainees revealed that they had been given loose fitting surgical masks, not N95 masks, and these masks were the only face covering they utilized to come out of their cells and shower . Alarmingly however, this unit also housed people who did not have COVID-19 and were not suspected of having COVID-19, including one detainee who had returned from hospitalization and rehabilitation for a non-COVID-19 related problem.

46. The trash container next to the PPE cart requires that one touch the container lid to open and insert PPE, and I observed every staff member who exited with us touch this lid, some with gloves and others with ungloved hands. There is no medical examination space inside this unit, which appears to be designed as a solitary confinement unit. Patients must be taken out of this unit for access to an examination room. medical examination . If staff are entering the cells of patients and attempting to conduct examinations on the bed of the patient or while they stand, this would represent a gross departure of basic correctional practice; it would represent inadequate examination, and also create increased risks for staff who already appear to lack appropriate PPE and who would be entering cells that lack negative pressure ventilation. I am gravely concerned that these practices are likely to cause (or have already caused) COVID-19 infection in the staff and other detained people in this unit. These deficiencies represent gross deviations from basic infection control and CDC guidelines and serve to work against any measures taken by the MDC to mitigate the spread of COVID-19.

47. I spoke with one detainee who is at high-risk of serious illness or death from COVID-19 who was transferred into the isolation unit for non-COVID-19 reasons. He also

reported that he was never screened in any manner before he came into the facility and into the unit. He expressed grave fears that he would contract COVID-19 on this unit and become seriously ill or die.[13] The lack of COVID-19 screening for people entering a facility, and the lack of medical isolation of people with known or suspected COVID-1 from other detained people represents gross deviations from CDC guidelines.

      B.     The Physical Environment at MDC is Conducive to the Spread of COVID-19

48.    During my physical visit to the MDC, I was concerned that the cells were much colder than the tier.  In fact, as soon as we entered into the unit, detainees began to yell about how cold their cells were.

49.    When I entered into an empty cell, it was significantly colder than outside the tier. When I entered the MDC, before the tour of the housing units, a staff member conducting temperature checks initially took my temperature, which was below 97'.  The staff member then asked if I had been outside in the cold and waited two minutes to recheck it once I had been standing inside.

50.    I observed the temperature screening in housing area 82 but saw no such process to mitigate the possible impact of environmental temperature on the temperature checks for detained people.  This concerned me because it indicates a lower standard of care in detecting elevated temperature among detainees.

**VI.    Assessment of the MDC's Efforts to Identify and Protect Detainees Particularly Vulnerable to the Effects of COVID-19 Due to High-Risk Factors**

51.    Based on my physical inspection of the MDC, it is my assessment that current practices in MDC do not adequately identify and protect detainees who are particularly

---

[13] ███████ (84) (transferred to the MDC from a nursing home on or about April 21, 2020; recovering from severe second and third degree burns).

vulnerable to the effects of COVID-19 due to their high-risk underlying medical conditions. This is despite the fact that the facility is aware that many such high-risk detainees exist.[14]

52.     According to the CDC, people who are "high-risk" include those who are older, and people with including: diabetes, asthma, coronary artery disease, hypertension, those who are immunocompromised, severely obese (body mass index ["BMI"] of 40 or higher), have chronic kidney disease and are smokers.[15]

A.     The MDC has Not Implemented Any Special Procedures for High-Risk Patients

53.     During my visit to the MDC I encountered several patients with risk factors for serious illness or death from COVID-19, including Mr. ██████████████████ ████████ and it was apparent that they had not been identified to receive any additional protection or surveillance for COVID-19 symptoms.

54.     Detainees also confirmed that the institutional toilets cause a spray—or plum— when flushed.[16]  This is a critical concern because of potential fecal-oral transmission of COVID-19 between cellmates, and the practice of having high-risk detainees in cells with other people. Conditions reported by these patients included poorly controlled asthma and coronary artery disease.  These patients indicated that the way they would need to report any COVID-19 symptoms would be to rely on sick-call, which is defective.

B.     Illustrative Examples

55.     While the deficiencies listed above represent information provided from patient interviews, physical inspection and document review, the case of two patients in the isolation unit is particularly illustrative of the systematic failures in MDC's response to COVID-19.

---

[14] Vasquez Deposition, pgs. 206-208.
[15]     https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html
[16] ███████████████████ (84).

56.     I interviewed Mr. ██████████████ and Mr. ██████████████
separately during my inspection.  Both men are in the isolation unit and are the only two men
being held on the unit because of COVID-19 related reasons.

57.     The two men were originally cell mates on unit 72 before they were transferred to
the isolation unit. Both men report that Mr. ██████████████ became ill while they were being
held in unit 72, with shortness of breath, chills, weakness to the extent he could not get out of
bed, and loss if taste and smell—all of which are signs of COVID-19 infection..

58.     Multiple requests for medical care were made by both men, including paper and
electronic sick call requests, attempting to ask orderlies and security staff for medical assistance.
They reported that after 3 or 4 sick call requests were made, a nurse came, took Mr. ████████
██████s temperature and left when the reading was normal, without asking any questions
about his symptoms.  The staff member who came did not ask for either of the men to be
removed from their cell and did not speak Spanish, which is the language both men speak.

59.     Several days after the initial sick call request was made, both men came out of
their cell multiple times to eat, shower and be on the unit.  Mr. ██████████████ also observed
his cellmate attempting to get help from correctional staff for being ill, but reports that none of
the correctional staff spoke Spanish. Several days after his cell mate became sick, Mr. ████████
██████reports that he became ill with similar symptoms.

60.     On April 15, 2020, after several sick call requests, nurses came to their cell and
took his temperature, which was elevated, and he was transferred to the isolation unit by staff not
wearing masks or gloves. Since arriving on this isolation unit, both men report (and I observed)
being given a surgical mask that hangs loosely on their face. Both men report coming out of his
cell for showers and other discrete activities. Mr██████████████ reports not being physically

examined or given medical care for many days and nobody has listened to his lungs with a stethoscope during this time.

61.     When I reviewed his medical records, there was no record of the sick call requests and the original sick call forms are not present.  In addition, there is no record of any care provided to him between April 17 – April 27, 2020.   Any patient in medical isolation for known or presumed COVID-19 case should be evaluated on a daily basis in a clinical setting including physical examination of their breathing, heart and lung sounds, vital signs and other basic COVID-19 concerns. Each person should also have their signs and symptoms checked twice per day. These assessments require a dedicated clinical examination space for the daily out of cell encounter and require use of interpreter services for both out of cell and cell side symptom/sign checks. Failure to provide this basic level of care, for patients who have already been identified as having COVID-19 represents a grave deficiency in care, and risks the rapid deterioration of these patients while locked in their cells. COVID-19 often progresses to include life-threatening pneumonia in the second week of symptoms. The denial of basic assessment in the very unit dedicated to hosing these patients, likely arriving in their second week of symptoms, is likely to create dramatically higher rates of serious illness and death due to late appreciation of deterioration.

62.     A dedicated clinical examination space should be located on any unit identified as a medical isolation unit, and staff who care for known or suspected COVID-19 cases should wear full PPE during these encounters including, N95 masks, face shields and gowns. These standards represent CDC guidelines and basic infection control standards.  Virtually none of these guidelines were followed in these two case examples. It is doubtful that MDC will be able

to enact these guidelines if they continue to utilize this shared unit, which lacks a clinical examination room, PPE cart and other basic infection control features.

63.     Staff in the isolation unit identified these two men as the only two people currently being housed for suspected or confirmed COVID-19.  According to jail staff, these men are the only two people in MDC identified as having or suspected of having COVID-19.  The gross failures in MDC's response to their repeated attempts for assessment and care indicate multiple systemic failures in the overall COVID-19 response.   I am therefore concerned that people are infected with COVID-19 who are not being detected by the facility, and that as the outbreak spreads, some of these people (detainees and staff alike) will become gravely ill when early detection of their illness, and slowing of the outbreak spread, could have instead been implemented.

## VII.    Minimum Expectations of Correctional Best-Practices

64.     Given the severity of the COVID-19 outbreak, and the clear guidelines outlined by the CDC, I would have expected that MDC implemented the following simple procedures in order to slow the spread of COVID-19:

  a.  Screening of all detainees for multiple COVID-19 signs and symptoms, even when individual temperatures are within normal limits;

  b.  Screening for all detainees who arrive at the MDC consistent with CDC guidelines, including for those returning from hospital admissions, and those who are transferred from other correctional settings;

  c.  Adoption of a standardized COVID-19 surveillance tool which includes COVID-19 symptoms and signs, including temperature checks, to be

19

administered twice daily by nursing staff to all incarcerated persons who possess high-risk factors, patients in quarantine, and patients in isolation;

d.  All patients who are suspected or confirmed to have COVID-19 should receive a standardized clinical evaluation at least daily by nursing staff in a clinical setting and not cell-side;

e.  Same-day review of every sick-call slip and electronic submission that will (i) trigger immediate (same day or next morning) assessment for COVID-19 and (ii) provide data that creates a facility wide symptom tracking dashboard that health care staff will use;

f.  Identifying, cohorting and testing of all detainees who possess risk factors for serious illness or death from COVID-19;

g.  Quarantine of all high-risk detainees into units with routine checks for COVID-19 signs and symptoms, including temperature;

h.  All quarantine units should follow CDC guidelines for management of COVID-19 including the use of appropriate PPE, cleaning of common surfaces, and exclude individuals not suspected to or confirmed to have COVID-19; including twice daily sign and symptom surveillance including temperature;

i.  Testing of patients who possess more than one sign and/or symptom of COVID-19;

j.  Testing of staff who possess (i) risk factors for serious illness or death from COVID-19; or (ii) more than one sign and/or symptom of COVID-19;

k.  Require that all staff wear personal protective equipment, including masks, when interacting with any person or when touching surfaces in cells or common areas;

l.  Provide sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and computers) between each use;

m.  Repair emergency call-buttons in cells in which those do not work; in the interim, conduct frequent medical rounds in those units where there are malfunctioning call buttons;

n.  Training for all staff and orderlies on the importance of reporting health-related problems among detainees to medical staff;

o.  Rotation of Spanish-speaking health staff, so that access to medical staff is maximized;

p.  Ensure that each incarcerated person receives, free of charge, adequate personal hygiene supplies for hand washing, disinfectant products effective against the virus that causes COVID-19 for daily cleanings; and access to daily showers and daily access to clean laundry;

q.  Provide adequate spacing of six feet or more between people incarcerated, to the maximum extent possible at the jail's current population level, so that social distancing can be accomplished;

r.  Appropriate facility staff should orient other staff and detained people on proper use of masks and gloves and other PPE.  Detained people to be provided with

adequate access to masks and gloves at no cost to them and the facility is to provide replacements when masks those masks become damaged; and

s. Weekly COVID-19 information sessions for detainees and correctional staff by a member of the MDC health team , that cover the status of the outbreak, efforts to mitigate the spread of COVID-19 and should take questions. This may include distributing a written document.

*      *      *      *      *

65.    I recommend that MDC implements these practices as soon as possible.

66.    I may develop additional recommendations as I review any supplemental materials or testimony in this case.

67.    Based on the above considerations, it is evident that the MDC has failed to implement straight-forward best-practices derived from the CDC guidelines as well as outbreak best practices.  Such practices would increase the safety of correctional staff, detainees and the general population.

68.    I am therefore concerned about the ongoing health and safety of the population at the MDC, and the likelihood of the continued spread of COVID-19 therein.


Executed on:   April 30, 2020
Port Washington, New York

_____
DR. HOMER VENTERS